IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

SHAWN FAHEY,

    *Plaintiff*

v.

NORFOLK STATE UNIVERSITY,

BOARD OF VISITORS OF
NORFOLK STATE UNIVERSITY,

and

FICTITIOUS PERSONS A-Z.,

    *Defendants.*

Civil Case No.

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff Shawn Fahey ("Plaintiff" or "Fahey"), by counsel, and moves this Honorable Court for Judgment against the Defendants Norfolk State University; Board of Visitors of Norfolk State University; and Fictitious Persons A-Z; and in support of his complaint, states as follows, *to-wit*:

I.    **INTRODUCTION**

1.    This suit is being brought pursuant to Title IX of the Education Amendments of 1972 (*i.e.*, 20 U.S.C. §§ 1681, *et seq.*) ("Title IX").

2.    In December 2020, Plaintiff committed to playing football at Norfolk State University. Plaintiff reported for practice in June 2021. In his brief time as a player, Plaintiff was hazed by other football players. As part of these hazing rituals, Plaintiff was sexually assaulted and harassed.

3.    Plaintiff reported the incident to his coaches, but no direct reports were made to the Title IX Coordinator as required by Title IX regulations. The university did not act on Plaintiff's

report until his mother emailed Javaune Adams-Gaston, the university's president. Even then, the university never advised Plaintiff of any steps that had been taken to protect him.

4. Because Norfolk State University had created a culture – spanning two coaching staffs – that enabled sexual assault and hazing of younger football players, Plaintiff gave up his position on the football team, along with his full tuition and housing scholarship, and did not register for classes – all to protect himself from further sexual assault and hazing.[1]

## II. **JURISDICTION**

5. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and civil rights jurisdiction under 28 U.S.C. § 1343.

6. Plaintiff has delivered notice to NSU regarding his state law claims pursuant to the Virginia Tort Claims Act ("VTCA"), Code of Virginia § 8.01-195.1, *et seq*. However, neither the six-month waiting period for the Commonwealth to review these state law claims has elapsed, nor has the Plaintiff received any notice of his state law claims being denied. Therefore, Plaintiff is presently unable to pursue these state law claims pursuant to the VTCA as they are not ripe for adjudication. However, Plaintiff intends to seek leave of the Court to amend this Complaint if he receives a denial of his claim or when the six-month period elapses. If and when either event occurs, this Court will have supplemental jurisdiction over these state law tort claims under 28 U.S.C. § 1367.

7. All relief available under the foregoing statutes is sought herein by the Plaintiff.

8. Personal jurisdiction exists over the Defendants as each Defendant has had sufficient minimum contacts with Virginia and this district because of residence within Virginia.

---

[1] See *John Doe v. Norfolk State University and Board of Visitors of Norfolk State University* filed June 1, 2022.

Alternatively, personal jurisdiction exists because all claims alleged in this complaint arise from actions occurring in Virginia and in this district.

III. **VENUE**

9. Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

10. Assignment to the Norfolk Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(3) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

IV. **PARTIES**

11. Plaintiff Shawn Fahey is of full age and majority and is a resident of the Commonwealth of Virginia. At all relevant times, Plaintiff was a student attending Norfolk State University and a player on the university's football team.

12. Defendant Norfolk State University is a public university formed under the laws of the Commonwealth of Virginia. It is governed by Defendant Board of Visitors of Norfolk State University, which approves all Title IX policies and procedures for the university. (Collectively, these Defendants shall be referred to as "NSU.")

13. Fictitious Persons A-Z are those persons, firms, corporations, or other entities who are in any way responsible to the Plaintiff for the damages he has sustained and whose identities are at this time unknown but will be added by appropriate amendments when ascertained.

V. **FACTS**

14. NSU is a public university located in Norfolk, Virginia, founded in 1935.

15. NSU's football team, the Norfolk State Spartans, participates in NCAA Division 1 as part of the Mid-Eastern Athletic Conference.

16. From April 2020 to May 2021, Plaintiff was in contact with an NSU Assistant Football Coach Brandon Torrey. During these months of contact, Coach Torrey tried to provide incentives for the Plaintiff to attend NSU and play football. For example, Coach Brandon Torrey gave assurances to Plaintiff's family that Plaintiff would be provided food and housing at NSU at no cost as part of his agreement to play football at NSU. Coach Torrey also built a rapport with Plaintiff by watching Plaintiff's high school football games and making him feel like a part of the team before arriving at NSU. Coach Torrey referred to Plaintiff as "my guy" and "my man" while encouraging him to commit to play at NSU.

17. On National Signing Day, (*i.e.*, December 16, 2020), Plaintiff signed his letter of intent to play football at NSU. See Exhibit 1. Plaintiff turned down two (2) other Division 1 offers, which also included full-ride scholarships.

18. In June 2021, Plaintiff signed a contract with NSU for a full scholarship to include tuition, room, board, and books. See Exhibit 2. On June 28, 2021, Plaintiff moved into NSU dormitories and began practice with the NSU football team.

19. While Plaintiff was trying to acclimate himself to college as a member of the NSU football team, he suffered sexual harassment and sexual assault in the form of fondling and groping by the same teammates that NSU had expected him to trust.

20. NSU had notice of these "grooming" behaviors, which included several upperclassmen football players repeatedly groping, grabbing, and making video calls with their genitalia exposed to younger players on the team. However, NSU swept these allegations under the proverbial rug.

21. Upon information and belief, NSU's current and past football coaches have witnessed NSU football players grabbing the crotches of other players, but they failed to report this behavior to the Title IX Coordinator. Over the years, this behavior has become normalized among the team and has been referred to by another coach as being "playful." This coach further stated, "We just never took [it] seriously."

22. Based on information reported by a witness, the prior head coach, Latrell Scott, knew of the hazing and sexual harassment that was taking place at NSU. According to this witness, Coach Scott repeatedly told NSU football players not to engage in this type of sexual harassment behavior. Nevertheless, these requests – not being followed up with stern discipline or the requisite Title IX investigations – fell on deaf ears.

23. Incoming freshman players would soon learn that upperclassmen would perpetrate acts of hazing in the form of fondling, groping, and voyeurism. If an NSU football player was ever told to "size up," it was understood that he was to drop his pants and expose his penis to the other player, whereupon the two players would compare penis sizes. Plaintiff was also aware of FaceTime video calls with at least one NSU upperclassmen football player exposing his genitalia to other NSU football players. One video recording shows an NSU football player holding down a freshman NSU football player and "dry humping" him from behind while others looked on and laughed.

24. On or about July 2, 2021, Plaintiff attended a party with other NSU football players. At this party, Plaintiff was followed into the bathroom by D.S., an NSU upperclassman football player. D.S. proceeded to stand behind Plaintiff while Plaintiff was urinating, staring at Plaintiff's penis. D.S. followed Plaintiff out of the bathroom shouting "puny, puny, puny," referring to Plaintiff's genitalia.

25. The following week, on or about July 6, 2021, D. S. grabbed Plaintiff's penis while in the stairwell of the dormitories. Plaintiff immediately pushed D.S. away and told D.S. to stop.

26. The next day (*i.e.*, July 7, 2021), J.P., who is another NSU upperclassman football player, grabbed Plaintiff's buttocks during football practice and inserted his thumb into the Plaintiff's intergluteal cleft. Other players on the field who witnessed this behavior commented that J.P. had "fingered" Plaintiff. Later that day, Plaintiff notified Coach Torrey that he would not return to practice the next day.

27. On July 8, 2021, Plaintiff sent an email to NSU Head Football Coach Dawson Odums to report the sexual assaults. In his email, Plaintiff indicates "he is nervous to get the other guys in trouble." Plaintiff also states that he told both D.S. and J.P. to stop touching him and because, "I don't mess with that kind of stuff." However, neither Coach Odums nor Coach Torrey reported any of these incidents to the Title IX Coordinator, Mr. James Robinson.

28. On July 9, 2021, Plaintiff's mother, distraught over the sexual assaults that were perpetrated on her son, sent an email to Javaune Adams-Gaston, president of NSU. It was not until after Plaintiff's mother had contacted President Adams-Gaston that Mr. Robinson contacted the Plaintiff regarding the reported sexual assault. At the time of the report, written notice was not sent out to the parties involved to indicate the allegations.

29. On July 12, 2021, Plaintiff met with Title IX investigator to file a report. During this meeting no interim measures were put in place to ensure Plaintiff had continued access to education and could continue to play football at NSU. Rather, Plaintiff was told that they would put in a good word for him if he wanted to transfer to another university.

30. On July 13-14, 2021, witness and respondent interviews were conducted. A notice of investigation and allegations was not sent to the respondents before the interviews were conducted. To date, no preliminary investigation report has been provided as of today's date.

31. On July 15, 2021, Mr. Robinson emailed Coach Odums indicating that no-contact orders had been issued to D.S. and J.P. Mr. Robinson encouraged Coach Odums to "inform the team as well." However, no one informed the Plaintiff about the no-contact order.

32. On August 10, 2021, a summary of witness interviews was provided to counsel for the Plaintiff. Neither Plaintiff, nor his advisor, received any more communications from the Title IX coordinator until March 2022. As of the date of this filing, there has been no final investigation report submitted and there has been no hearing with cross-examination conducted as required by the August 2020 Title IX Final Rule. Thus, neither the Plaintiff nor his advisor was able to examine the respondents.

33. In addition to receiving a milquetoast reaction from the Title IX office, Plaintiff also suffered retaliation from his peers. He was called "homophobic" by other NSU upperclassmen football players for telling D.S. and J.P. that (1) he did not want to be touched and that (2) it is "not ok" to stare at Plaintiff's penis while he is urinating.

34. Due to the persistent harassment and the culture of deliberate indifference by NSU and its coaches, Plaintiff chose to protect himself from further sexual assault and hostility by giving up his dream of playing college football and receiving a bachelor's degree from NSU. Thus, he did not register for classes on August 27-28, 2021, during the departmental advising and registration period. Likewise, when classes started on August 30, 2021, he was not present on campus. In the 274 days that have elapsed since the start of Fall classes at NSU, Plaintiff has been in a state of educational limbo.

VI. **CAUSE OF ACTION**

*VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972: HOSTILE EDUCATION ENVIRONMENT AND DELIBERATE INDIFFERENCE*

35. Plaintiff re-alleges and incorporates by reference the allegations set forth in the entirety of this Complaint as if fully set forth herein.

36. NSU is responsible for the acts and omissions of an employee when the employee is acting within the scope of their employment and on behalf of their employer. At all times relevant, NSU employees named in this complaint were acting in the course and scope of their authority at NSU and on behalf of NSU. Thus, NSU is responsible for their acts or omissions.

37. At all relevant times, NSU was receiving federal funding as contemplated by Title IX. Therefore, Title IX abrogates NSU's Eleventh Amendment sovereign immunity. *See Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 71-73 (1992); *see also Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287-90 (1998).

38. Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

39. According to the U.S. Department of Education's 2020 published rule on Title IX, all schools receiving federal financial assistance must respond to

> … allegations of sexual harassment consistent with Title IX's prohibition against sex discrimination. These regulations are intended to effectuate Title IX's prohibition against sex discrimination by requiring recipients to address sexual harassment as a form of sex discrimination in education programs or activities. The final regulations obligate recipients to respond promptly and supportively to persons alleged to be victimized by sexual harassment, resolve allegations of sexual harassment promptly and accurately under a predictable, fair grievance process that provides due process protections to alleged victims and alleged perpetrators of sexual harassment, and effectively implement remedies for victims.

85 FR 30026 (effective August 14, 2020).

40. Under the Title IX final rule issued by the U.S. Department of Education, a school is deliberately indifferent if the response is not reasonable in light of the known circumstances. To this end, a school's Title IX Coordinator is required to promptly contact the complainant, provide supportive measures, and explain the process of filing a formal complaint.

41. NSU Title IX policy states, "Every NSU employee who is informed about an allegation of sexual misconduct involving any student, staff, or faculty member, is required to notify the Title IX Coordinator, or his or her designee either directly or through an appropriate reporting mechanism such as email or by phone."

42. NSU's Title IX policy also states, "[C]ertain NSU employees, called 'Responsible Employees' are required to report to the Title IX Coordinator all information disclosed to them about an incident of Prohibited Conduct."  At all material times, Head Coaches Scott and Odums and assistant coaches were "Responsible Employees" under the NSU Title IX policy.

43. NSU has a policy to address hazing that is provided to the students at the beginning of the spring and fall semesters.  The policy is also published in the student handbook and distributed to the University community.  The policy defines *hazing* as "any action or situation, whether on or off University premises, that is harmful or potentially harmful to an individual's physical, emotional, academic or psychological well-being, regardless of an individual's willingness to participate or its bearing on his/her membership status."  The NSU hazing policy requires all University employees and students to report all "real and suspected acts of hazing to the NSU Police Department" and prohibits retaliation for reporting.  In addition, the REACH Act requires institutions of higher education (IHEs) that participate in federal student-aid programs to report hazing incidents and implement hazing education programs.  Specifically, the Act requires

each IHE to disclose hazing incidents that were reported to campus officials in its annual security report.

44. NSU is responsible for ensuring all responsible employees and athletic department staff are properly trained in Title IX and are supervised in performing their jobs (*see* 34 C.F.R. § 106.45 (b)(1)(iii)). Coach Odums and Coach Torrey had not completed Title IX training between the months of June 1, 2021 to November 1, 2021. Coach Odums completed the training for campus security authorities (CSA) on November 1, 2021, well after the start of the football season and well after these sexual assaults had taken place.

45. The Title IX regulations require:

> … reasonably prompt time frames for conclusion of the grievance process, including reasonably prompt time frames for filing and resolving appeals and informal resolution processes if the recipient offers informal resolution processes, and a process that allows for the temporary delay of the grievance process or the limited extension of time frames for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action.

34 C.F.R. § 106.45(b)(1)(v). Furthermore, at postsecondary institutions,

> … the recipient's grievance process must provide for a live hearing. At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally….

34 C.F.R. § 106.45(b)(6)(ii).

46. NSU had actual notice of the sexual assault against the Plaintiff when it was reported on or about July 8, 2021. However, NSU did not follow the proper procedures in reporting or providing interim measures for the Plaintiff.

47. On July 8, 2021, the Plaintiff reported to Coaches Torrey and Odums the sexual assaults and hazing. Neither Coach Torrey nor Coach Odums reported the sexual assault to Mr. Robinson or the hazing to the NSU police as required by NSU's policy. Instead, Coaches Torrey

and Odums decided to discuss it with the NSU football team in hopes of addressing the sexual assault and hazing without notifying the Title IX office. Thus, they continued to demonstrate deliberate indifference by attempting to hide the culture of sexual assault and sexual harassment that had been rampant among the NSU football team for years.

48. NSU's investigation and response to the Plaintiff's sexual assault complaints were insufficient. NSU's response did not comply with basic due process requirements or accepted Title IX response requirements as outlined in guidance from the U.S. Department of Education, Office for Civil Rights. Plaintiff was not contacted regarding a formal investigation process or interview until March 2022, well after he had stopped attending NSU. As a result of the deficiencies in the Title IX process at NSU, there was not a live hearing with cross-examination as required under the August 14, 2020, Department of Education's Title IX final rule.

49. NSU failed to follow its own policies in responding to or investigating complaints of sexual assault, which include specific deadlines on providing notification to the parties involved, time frames of the investigation, details on how interviews will be conducted, and the final reports and recommended findings to be provided to the parties in the investigation. This created a hostile educational environment for the Plaintiff, thereby necessitating his withdrawal from the NSU football team and from the university, itself, for his own well-being.

50. Had NSU provided meaningful follow-up to his complaint and notified him of the same in a timely manner, Plaintiff would not have left school. He would have remained on the football team, registered for classes on August 27-28, 2021, and attended classes on August 30, 2021. However, because NSU was deliberately indifferent to his complaint, Plaintiff was left with no realistic means of protecting himself from the sexual abuse and ridicule of his teammates other than leaving the situation. Therefore, because the physical nature of the assaults was so severe and

pervasive, and because he had received insufficient feedback from the NSU Title IX office, Plaintiff withdrew from the football team in July 2021 and did not register for classes in August 2021. Thus, Plaintiff was denied the ability to participate in his education as a direct and proximate result of Defendants' actions and/or inactions. Ergo, Defendants violations of Title IX continued until at least August 30, 2021.

51. NSU had an obligation to address Plaintiff's report of sexual assault against D.S. and J.P. and remedy any resulting hostile environment created for Plaintiff on campus because of the sexual assault, such as retaliation from other teammates, as it constituted severe and objectively offensive sexual harassment, which is a form of prohibited sex-based discrimination under Title IX. NSU also had an obligation to address Plaintiff's report of sexual assault against D.S. and J.P. because that sexual assault was part of a pervasive pattern of sexual harassment that NSU had actual knowledge was occurring routinely by the football team.

52. At all material times, NSU exercised substantial control over D.S. and J.P. because they were NSU football players who could have been removed from the team for rules infractions. After receiving actual notice of the on-campus sexual assault, NSU had an obligation to provide Plaintiff with prompt and equitable interim remedies to ensure his ongoing access to a safe campus free from a hostile environment. NSU also had an obligation to ensure his continued access to education programs and activities through the provision of reasonable academic, housing, and other available accommodations.

53. Despite its obligations to Plaintiff, NSU showed deliberate indifference to the sexual assault of Plaintiff by failing to provide him with prompt and equitable interim remedies and safety measures. To the extent that they may have provided no-contact orders, these were not reported to Plaintiff, making them of no practical effect. Plaintiff still believed that D.S. and J.P

would be able to harass him. Beyond this, Plaintiff understood that other players, mindful of what had transpired, would continue to ridicule him for even reporting D.S. and J.P, thereby creating a hostile environment. Thus, by its actions and omissions, NSU effectively denied and/or limited Plaintiff's ability to participate in or to receive benefits, services, or opportunities from NSU's educational programs or activities.

54. NSU failed to take Plaintiff's complaint of sexual assault seriously. NSU coaches did not report the same to the Title IX office immediately. Then, when the Title IX office learned by way of Plaintiff's mother's email to NSU's president, the Title IX office slow walked the investigation. In the meantime, NSU failed to protect other male members of the NSU football team, which directly led to further sexual harassment, sexual assault, and sex discrimination on campus.[2] Thus, NSU's actions and inactions created and/or contributed to the ongoing hostile educational environment that Plaintiff suffered, and others have continued to suffer.

55. The university had actual knowledge of sex discrimination including sexual harassment and sexual assault occurring by members of the NSU football team and acted with deliberate indifference towards the rights of Plaintiff to a safe education environment. NSU had actual knowledge as evidenced by the passing of this problem from on Head Coach to another Head Coach. This deliberate indifference impaired Plaintiff's ability to participate in and benefit from educational programs and activities at NSU.

56. NSU did not promptly conclude the investigation with a finding and did not take proactive steps to prevent its recurrence or remedy its effects. NSU knew of the sexual harassment and did not take appropriate steps to ensure Plaintiff could continue to benefit from the school's programs. If NSU had not been deliberately indifferent to the reported sexual assault and had not

---

[2] A month after Plaintiff's reported sexual assault, another NSU football player was sexually assaulted.

taken self-serving action to protect its own interests, Plaintiff would have retained his scholarship, exercised his opportunity to play football, and pursued his education at NSU.

57. NSU had knowledge of this pervasive culture of sexual harassment on the football team and acted with utter disregard in investigating and preventing further harassment to the Plaintiff. The Defendants' acts, omissions, policies, and customs resulted in sexual harassment that was so severe and pervasive it denied Plaintiff the right to participate as both a student and an athlete at NSU. Thus, Plaintiff was denied equal educational opportunities in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a).

58. Plaintiff suffered financial loss from being denied equal educational opportunities in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a). Plaintiff suffered the loss of his full scholarship to NSU, loss of room and board, loss of educational opportunity, loss of future income, and loss of income as derived from his name, image, and likeness as allowed by the NCAA.

59. As a result of NSU's deliberate indifference and hostile education environment Plaintiff was forced to withdraw from NSU and the football team and has suffered pecuniary and non-pecuniary damages in the amounts to be adduced at trial.

## JURY TRIAL DEMANDED

Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendants as follows:

(a) That the Court declare that Defendant's actions, policies, and practices complained of herein violated Plaintiff's rights under Title IX of the Education Amendments of 1972;

(b) Injunctive relief requiring NSU to redress its violations of Title IX, including (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment and hazing policy, including procedures for effective reporting of sexual harassment and hazing incidents, an effective and immediate crisis response, and an expended victim assistance and protection program; (2) adopting a "zero tolerance policy" under which there will be expedited proceedings and punishment proportional to the offense for violation of sexual harassment and hazing policies; and (3) providing for an annual, independent review by the Office of the President, with the participation of outside reviewers, of Athletic Department compliance with the sexual harassment and sexual hazing policies;

(c) An award of damages against NSU in an amount to be established at trial, including, without limitation, payment of Plaintiff's full scholarship and tuition to NSU to include room and board; payment of Plaintiff's expenses incurred as a consequence of the sexual assaults; damages for deprivation of equal access to the educational benefits and opportunities provided by NSU; damages for loss of future income; damages for loss of income as derived from Plaintiff's name, image, and likeness as allowed by the NCAA; and damages for past, present, and future emotional and psychological harm (where allowed by law);

(d) An award of pre- and post-judgment interest;

(e) An award of cost and attorney fees, pursuant to 42 U.S.C. § 1988(b); and

(f) Such other relief as is just and equitable.

    Respectfully Submitted,

_____/s/_____
Diane P. Toscano, Esq.
Virginia Bar No. 73478
TOSCANO LAW GROUP, P.C.
1244 Perimeter Parkway, Suite 443

        Virginia Beach, Virginia 23454
        Tel:    (757) 821-7972
        Fax:   (757) 903-0186
        Diane@toscanolawgroup.com
        *Attorney for Plaintiff Shawn Fahey*